## THE STATE v. WILSON, *Appellant.*

### Division Two, May 8, 1894.

1. **Criminal Practice**: EVIDENCE: DYING DECLARATION. A dying declaration, to be admissible in evidence, must clearly appear to have been made under a well founded apprehension of immediate or impending dissolution.

2. ———: ———: ———. A written statement made by deceased six days before his death, and purporting to be his dying declaration, *held*, to have been properly admitted in evidence.

3. ———: ———: ———. It was not error to exclude parts of such statement not referring directly to the crime, after the defendant had objected to all the statements therein.

4. ———: JURY: READING NEWSPAPERS. Where a jury, after reaching their verdict, and while waiting for the judge, read the morning papers which did not refer to the crime, defendant is not prejudiced.

5. ———: VERDICT: SUNDAY. A verdict arrived at on Sunday morning, after a submission on Saturday night, and an adjournment then till Sunday morning to receive the verdict is valid.

6. **Murder in First Degree.** A conviction of murder in the first degree *held* to be sustained by the evidence in this case.

*Appeal from St. Louis Criminal Court.*—HON. HENRY L. EDMUNDS, Judge.

AFFIRMED.

*F. H. Braden* and *W. M. Farmer* for appellant.

*R. F. Walker*, Attorney General, and *C. O. Bishop* for the state.

(1) The motion for new trial does not assign as error the exclusion of any testimony offered by the defendant, but only the admission of improper evidence over his objection. The record discloses that the only evidence thus admitted, to which any exception was saved, was the dying declaration. There was no error in the admission of this statement of deceased. The prerequisites existed, viz.: the fact that the declarant was at the point of death, and that he entertained a well founded belief that he was about to die. *State v. Simon*, 50 Mo. 370; *State v. McCannon*, 51 Mo. 160; *State v. Jefferson*, 77 Mo. 136; *State v. Mathes*, 90 Mo. 571; *State v. Stephens*, 96 Mo. 638; *State v. Umble*, 115 Mo. 452. (2) The declaration admitted in evidence was clearly within the rule as to facts stated. It referred solely to the immediate act of shooting, identified the actor and stated no opinions, conclusions or suspicions. *State v. Chambers*, 87 Mo. 406; *State v. Vansant*, 80 Mo. 67. (3) The defendant admitted the shooting at the time and place charged, and pleaded justification. *State v. Pagels*, 92 Mo. 300. (4) The whole of the written statement of deceased is not called for nor set out in the record. This court will not presume error, but unless there is something in the record

to the contrary, will presume that the ruling of the trial court was correct. (5) There is not a syllable of testimony in the record tending to show that the jury were separated before rendering the verdict. The affidavits filed by appellant in support of his motion for new trial do not allege that the jury were separated, nor that any communication was had with them by any person before verdict. (6) There is no law which forbids a jury to deliberate upon and find a verdict upon the first day of the week, commonly called Sunday, but it is lawful for a court to hold a session on Sunday to receive a verdict and to discharge the jury. R. S. 1889, sec. 3260. It is hardly reasonable to presume that the framers of this law referred to a verdict found on Saturday. (7) The instructions given by the court covered all the law of the case, and followed the most approved precedents. (8) The indictment is drawn under section 3459, Revised Statutes, 1889, and is sufficient.

BURGESS, J.—From a conviction of murder in the first degree, by shooting one Moses Hodges to death with a pistol, the defendant has appealed to this court. The shooting is charged to have occurred on the eighth day of November, 1892, in the city of St. Louis, inflicting upon said Hodges a wound from which he died in said city on the eighteenth day of December next thereafter. The trial was begun on Saturday, May 13, 1893, the evidence heard, instructions given and the case submitted to the jury about 11:30 P. M., when the court adjourned until the following Sunday morning, May 14, at 10:30 A. M., to receive the verdict, at which time the jury rendered their verdict, finding the defendant guilty of murder in the first degree.

Motion for new trial was filed, supported by affidavits; counter affidavits were filed by the state; the motion was overruled, as was also a motion in arrest.

Defendant and deceased were negroes.   Both were rivals for the affections of one Lyda Nichols, a colored woman residing in the city of St. Louis.   She occupied one room on the ground floor of a building fronting on the street.   A porch was in front of the door, and a pass way ran beside the house, leading to a yard in the rear, where there were other tenements, and thence into an alley.

At about 3 o'clock of the day of the shooting, deceased called at the woman's house and, finding her at home, entered her room and sat down by the stove upon a "stool chair" (so called by the witnesses) with his face toward the stove, his back towards or near the wall, his right side towards the door and he was leaning forward with his hands clasped around his knees. He had been sitting in this position but a few minutes conversing with the woman, when defendant entered the door, advanced into the room, raised a pistol, pointed it at deceased, and exclaimed, "I've got you now!" The woman cried out, "Don't shoot, Mr. Charley!" and ran out of the door, leaving deceased sitting in the same position on the stool chair.   As she crossed the doorsill she heard the report of a pistol within, saw appellant come out of the room and run towards the rear.

Another colored woman, Delia Jackson, who lived in the rear, was on her way, with a little child, to visit Lyda, and just about to step upon the porch, when defendant passed her rapidly, sprang upon the porch and went into Lyda's.   As he entered the door she saw him draw "something shining" out of his pocket. Being frightened, she took up her child and ran into the adjoining yard.   She saw Lyda come out, heard the report of the pistol, and immediately afterward saw defendant come out, jump off of the porch and run to the rear.

A third colored woman, Susie Taylor, living a short distance off, was washing clothes at her window; saw deceased come down the street and enter Lyda's house. About five minutes afterward saw defendant come from the rear, pass Delia and enter the house; about two minutes afterward saw Lyda run out into the street, heard the pistol and saw defendant come out, put his hand in his bosom, jump off of the porch and run to the rear along the gangway. She hurried over to the house, went in, and found deceased apparently helpless, lying *on the chair*, his back against the wall, one leg stretched out on the floor, the foot under the stove, the other leg hanging over the chair, one hand lying on the floor and the other against the wall. Some men coming in lifted him up and laid him on the bed. The wounded man was taken to the city hospital where he died from the wound on the eighteenth day of December, 1892.

Search was made by the officers for the defendant that afternoon and night and for several days after, but he could not be found. In the early part of December it was learned that his trunk had been expressed to Chicago. Inquiries there led to his arrest in that city, and on the twelfth day of December he was brought back to St. Louis through a requisition. He disclaimed all knowledge of the shooting, and when accused of it replied, "If they say so they will have to prove it."

When taken to the hospital deceased was suffering intensely. A bullet wound was found in the axillary line *of the right side*, about two inches below the arm pit, between the third and fourth ribs. He was paralyzed in both legs, also in his abdominal muscles, and in his intestines and bladder, so that he passed his water and fæces involuntarily. On the second or third day after, traumatic pneumonia set in. He gradually

sank, and four days before death became delirious. The autopsy showed that the bullet had passed downward from the point of entrance, went through the right lung, and was embedded in the muscles surrounding the spinal cord, pressing upon the cord itself, which was atrophied from the pressure.

A statement was obtained from deceased six days before he died as to the circumstances of the shooting, which was reduced to writing at the time and signed by him in the presence of the attending physician, two police officers and the defendant. A part of this testimony was admitted in evidence by the court as a dying declaration.

The testimony on the part of the defense tended to show: That on the day of the shooting, about noon, deceased had a conversation with one Winston, in which he stated that he had had a fuss that morning, but would not tell with whom nor what it was about During the conversation he put his hand in his bosom, drew out a pistol and remarked, "I'm fixed for any one that bothers me now." It does not appear that these remarks were communicated to the defendant nor that his name was in any manner connected therewith.

That about half past 9, the same day, deceased said to one Brown, "I'm going to kill somebody before 6 o'clock to-night, or they'll kill me." And when pressed to tell who that somebody was, replied that it was Charley Wilson, and at the same time showed a revolver; and that this remark was communicated to defendant about an hour later. The witness Brown admitted that some days after the shooting, he had received a letter from defendant written from Chicago, and that in response thereto he expressed defendant's trunk to him there, and that he knew the police were looking for defendant at the time; he also admitted

that he had been a prisoner in the city jail since that time where he had met the defendant every day.

That between 11 and 2 o'clock of that day, deceased was in company with defendant and one Burrell, walking through an alley in the neighborhood of the homicide, and that deceased made the remark, "I've a notion to kill some son of a bitch around here;" but no name was mentioned; that they walked on to another alley and stopped to look at some things dumped into a lot, and there deceased stepped back and put his hand in his bosom, when Burrell stepped between him and defendant, and said, "Come on, let's get out of this alley." That they went on to another alley, where they met some other men, one of whom said to deceased, "I see you are limping," and deceased replied, "I am lame; that is the reason I'm walking around here, but I'm scared of no bastard." The witness Burrell had also been a prisoner in the city jail since the homicide, and it was shown that he had offered the state's witness, Susie Taylor, $2 to sign some papers for the benefit of defendant, and to keep away from court.

That deceased, a short time before the shooting, had requested one Sims to tell defendant to come over to Lyda Nichols' house, that some one wanted to see him there, but not to tell defendant who it was; that Sims went to defendant's house while the latter was eating his dinner and delivered the message; but Sims testified that he told defendant that it was Moses Hodges (deceased) who wanted to see him there.

That on the second day after the shooting a woman named Price, with her husband, called to see deceased at the hospital, and asked him what Charley had shot him for, to which deceased replied that "it was an old grudge between me and Charley," and that "he told Charley that morning that he'd fight him any way he wanted to fight."

Defendant testified in his own behalf, substantially as follows:

"I was eating dinner at home when Sims came and told me that some one up at Lyda's wanted to see me. I asked him who it was, whether it was a man or a woman, and he replied, 'He told me not to tell who it was.' I went over to Lyda's and knocked at the door and she said, 'Come right in.' And I goes in, and the moment I goes in, she tracks and runs out and begins to holler, 'Don't you go to fussing and quarreling in here.' I says, 'What's the matter, what are you hollering about?' She says, 'I don't want you fussing and quarreling in here.' So she ran out the door, and Hodges rose and he says to me, 'Well, I reckon G—d d—n it! I reckon we might as well settle this to-day.' I says, 'Settle what?' He says, 'you know d—n well what.' I says, 'I don't know anything about it.' That time he ran his hand in his bosom. He had on a navy blue shirt, and had two buttons of his shirt open. He made to pull his revolver out and I saw the handle of it, and I had mine in my coat pocket, and when I see the handle of it, I pulled out mine and let him have the contents of mine. I shot one shot. I couldn't say whether I hit him or not, but I could see from his movement I hit him. He fell towards me. He fell down on the floor, and then I turned and went out the door and went through the alley out in the rear. I was in there about five minutes. * * * James Brown told me about threats that day. I don't remember anyone else telling me that he made threats about me that day. I was told that he was armed with a revolver. I was armed when Brown told me that Hodges attempted to shoot me about a month previous to this, when we had some trouble. When I went to Lyda's house I did not know Hodges was there. Sims did not tell me it was Hodges that sent for me, and when he said that he did

on the stand to-day, he told a falsehood. I didn't know Mose was in there till I opened the door." In rebuttal the state offered the testimony of a police officer who stated that he went to Lyda Nichols' house immediately after the shooting, found Hodges lying upon the bed and that he examined his person all over "from his shoes up to his neck," and could not find any weapon upon him; and that he also searched the room all around and could not find any revolver.

No brief has been filed on behalf of defendant. The first point raised in the motion for a new trial is that the court erred in admitting in evidence a written statement purporting to be the dying declaration of deceased. The evidence of the two physicians, Drs. Marks and Born, who attended deceased after he received the pistol shot which they say caused his death, and until his demise, shows beyond question that he never had from the time of the injury any hope of recovery; that he repeatedly stated to them that he was going to die and that they, at no time, intimated to him he would recover; that they felt confident that he could not get well. This statement was made by deceased six days before he died, and was reduced to writing, signed by him in the presence of one of the physicians, two police officers and the defendant.

In order that a dying declaration may be admissible in evidence it should be made to clearly appear that such statement was made under a well founded apprehension of immediate or impending dissolution and that all hope of recovery was gone. *State v. Simon*, 50 Mo. 370; *State v. McCannon*, 51 Mo. 160; *State v. Mathes*, 90 Mo. 571; *State v. Stephens*, 96 Mo. 638; *State v. Umble*, 115 Mo. 452. These authorities abundantly show that the court committed no error in admitting in evidence the dying declaration of deceased.

Nor was there error in excluding that part of the

statement of deceased which had no direct reference to the shooting, and especially when all of the statements contained in the paper offered had been objected to by defendant. Moreover the whole of the written statement of deceased is not called for nor in the record and under such circumstances the presumption will be indulged in favor of the correctness of the ruling of the trial court.

The record does not show that any other evidence was introduced over the objection of defendant to which exceptions were properly saved.

Another point raised is that the jury were permitted to separate before rendering their verdict, but this is not sustained by the record. In fact the record shows that the jury were kept together all the time after they were sworn to try the case and at no time were they allowed to separate until after they had returned their verdict and been discharged by the court.

After the jury had come to a verdict and had been brought into the court room to deliver it, and while waiting for the presence of the trial judge to receive their verdict they were permitted to, and some of them did, read the morning papers of that morning and this is also urged as error in the motion for a new trial. In support of the motion on this point the affidavits of several different persons were read in evidence, but in no one of them is it stated that any reference was made in any of the papers read by the jury to the case in hand, and it is impossible from the facts as they are made to appear to us, that the defendant could have, in any manner, been prejudiced by the act of the jury in this regard.

Another ground upon which a new trial is asked, is that the deliberations of the jury were had on the first day of the week, commonly called Sunday, and

that the finding of the verdict was on that day. Section 3260, Revised Statutes, 1889, reads as follows:

"No court shall be open or transact business on Sunday, unless it be for the purpose of receiving a verdict or discharging a jury; and every adjournment of a court on Saturday shall always be to some other day than Sunday, except such adjournment as may be made after a cause has been committed to a jury" * * *.

It appears from the record that the court adjourned from about 11:15 to 11:30 o'clock on Saturday night until Sunday morning at 10 o'clock and thirty minutes "to receive the verdict herein" and by the affidavits of some of the jurors that they arrived at their verdict on Sunday morning. While the statute prohibits the keeping open court on Sunday or the transaction of any business on that day unless it be for the purpose of receiving a verdict, it does not prohibit a jury from making a verdict or arriving at a conclusion on that day, but by implication at least provides that they may do so. Making a verdict is a ministerial and not a judicial act and for that reason a verdict may be received on Sunday. 1 Bishop on Crim. Proc., sec. 1001. It is not necessary that courts should be open while juries are considering of their verdicts. In fact it often occurs that verdicts are made when court is not open, and during adjournment from one day to another. The case in hand was submitted to the jury before 12 o'clock Saturday night, and is unlike the case of State v. Green, 37 Mo. 466, wherein the trial court submitted the case to the jury after midnight on Saturday night, and it was held to be error.

We have examined, with much care, the instructions given in the case, and have been unable to discover any objections thereto. They seem to cover

every phase of the case, to follow the most approved precedents, and are very fair to the defendant.

The defendant admitted the killing and under-took to justify it upon the ground of self-defense, but there is but very little evidence to sustain this theory of the case. The murder seems to have been deliberate and premeditated. The indictment is well enough, and we have been unable to see any objection to it.

The judgment will be affirmed. All of this division concur.